## POWELL *vs.* SAMMONS & DOTES.

[ATTACHMENT AND GARNISHMENT.]

1. *What demands may be subjected by garnishment.*—The only money demands which can be reached by process of garnishment are those which, from their nature, the debtor himself might recover in debt or *indebitatus* assumpsit.

2. *What defenses garnishees may make.*—A garnishee is entitled to retain for any debt which he shows to be due to him from the defendant in the original suit, and to recoup for any damages arising out of the contract or transaction in respect to which the plaintiff in the garnishment seeks to hold him liable.

3. *Constitutionality of act of* 1854 *providing summary remedy against plank-road companies.*—The act of Feb. 17, 1854, (Sess. Acts 1853–4, p. 51,) authorizing the toll-gates of any plank-road company to be thrown open, on the report of commissioners appointed by the probate court that such road was out of repair, is, as to the Central Plank-Road Company, unconstitutional and void, because it impairs the obligation of the contract between the company and the State, and takes away the vested franchise of the company without compensation, without trial by jury, and without due process of law.

4. *Contract not avoided by unauthorized act of third person.*—The act of commissioners, under an unconstitutional statute, in throwing open the toll-gates of an incorporated plank-road company, does not affect the rights or liabilities growing out of a contract between the company and a mail-contractor for the passage of stages over the road : the company is still bound to keep its road in repair, and the mail-contractor equally bound to pay the stipulated price for the use of the road.

5. *Breach and rescission of contract.*—A breach of contract on the part of a plank-road company, in obstructing or hindering the stages of a mail-con-

Powell v. Sammons & Dotes.

tractor while running on the road, gives the party thereby injured a right either to abandon the contract, or to treat it as still subsisting and claim damages for the breach.

6. *Abandonment of road by plank-road company.*—If an incorporated plank-road company abandons its road, leaving its gates open, and keeping no agent at them to receive or demand toll, it cannot charge a person, as on an implied contract, for his use of the road during the continuance of such abandonment.

7. *Construction of charter of plank-road company as to right to charge toll.*—Where the charter of a plank-road company confers on it, in general terms, without any restrictive words, a right to charge toll for the use of its road, this does not, *it seems*, authorize it to charge unreasonable tolls.

APPEAL from the Circuit Court of Coosa.

Tried before the Hon. ROBERT DOUGHERTY.

THE appellant was summoned by process of garnishment, at the suit of the appellees, as the debtor of the Central Plank-Road Company, and answered in open court as follows:

" That he had a contract with said Central Plank-Road Company, by the terms of which he was to pay $20 per mile, *per annum*, for running his stages over the road of said company. When that contract went into effect, sixty-five miles of the road were completed. He paid the company, to the 1st August, 1853, all they claimed he owed them. From the 1st August to the 24th December, 1853, he was indebted, if the company had complied with their contract; during that time he paid nothing. He had the use of the road from 1st August to 24th December, 1853, except on the 1st, 2d and 3d days of August, when he was interrupted by the company, and was prevented from traveling the road with his stages. Said contract with the company was to extend to the 1st July, 1854. He used the road from the 24th December, 1853, to the 1st July, 1854, except such parts of it as could not be used. He remembered but two places where the road could not be used, but was informed of many others. From the 1st July, 1854, to the present time, Powell & Taylor used the road for running stages; but, for two months of this time, they used it in the name of Wilkins. On the 2d March, 1854, the gates on the road were thrown open by operation of law. From the 24th December,

36

1853, to the 2d March, 1854, he used the road; but he denies that he is liable to pay for the same, either under said contract or otherwise. From the 2d March to the 1st July, 1854, he used such portions of the road as could be used; but he denies that he is liable to pay for it, either under the contract or otherwise, the gates having been thrown open by operation of law, by order of the commissioners under an act of the last legislature. From the 1st August to the 24th December, 1853, he claimed the right to use the road under said contract; but he neither admits nor denies that he owes anything for it. From the 1st July, 1854, up to the present time, Powell & Taylor used the road, but not under any contract with said company or any other person. He denies that he owes anything for using the road from the 1st July, 1854, to the present time; because the road had been thrown open to the use of the public, by commissioners under an act of the legislature. The money for running the road was, under the contract, to be due annually; the first annual payment to be made on the 1st July, 1853, and the second on the 1st July, 1854. He settled up with the company to the 1st August, 1853, and paid about $100 (the amount not recollected) under protest. This was a charge for crossing two bridges, for crossing which he was not liable to pay anything; and he claims this as a set-off.

"Garnishee, further answering, says that, after being prevented from running the road with his stages on the 1st, 2d and 3d August, he filed a bill in chancery against said company, for an injunction, and sued out a writ of injunction, after giving bond with the usual conditions in such cases. Said bill was not filed to enforce a specific performance of the contract; it is still pending, but the injunction dissolved. He claims $300 from the company for the non-compliance with the contract on their part. He has been informed that the plank-road was sold on the 1st May, 1854. The company abandoned the road from and after the 2d March, 1854; the gates were opened, and the company had no agent on the road to receive or claim toll, and no toll was demanded up to this time. When

the contract was made, the road was in good repair, but is now in bad condition. Injury 25 per cent. on that account on the value of the use of the road from the 1st July, 1854, and 10 per cent. for six or eight months preceding that time. The validity of said contract is in issue in said chancery suit; the company denying its validity, and garnishee insisting that it is valid and binding. Wilkins used the road for two months; but Powell & Taylor made no contract with him to assume any liabilities for any trespass committed, or damages done by him to said road. The contract speaks of annual settlements only, and nothing is said in it about bridges; except as to a bridge over the Tallapoosa river, for crossing which he was to pay when it was built. This bridge was on the Montgomery and Wetumpka plank-road, which was embraced in the same contract with the Central plank-road. He claims under the contract the right to use the entire length of the road, without any extra charge for crossing bridges, except said bridge that was to be erected over the Tallapoosa river; and was to pay, to the Montgomery and Wetumpka Plank-Road Company, about $100 *per annum*, ferriage across said river. He was interrupted in crossing said ferry by the ferry-man, under the direction, as he said, of John G. Winter, the president of the Central Plank-Road Company, and was required to pay toll before his stages were permitted to cross the ferry. This was in the latter part of the fall or winter, 1853. Again, in March, 1854, he was required to pay toll at said ferry by the same authority, and was thereby forced to quit [crossing] in said ferry. There was no toll-gate at any one of the bridges on said Central plank-road, nor was any toll ever demanded of him at any of said bridges. The Central Plank-Road Company never interrupted him at said ferry on the Tallapoosa river, except John G. Winter, its president. At the time of the alleged violation of said contract, John G. Winter, claiming to act as the agent of the Central Plank-Road Company, demanded of garnishee $12,000 or $13,000 *per annum* for 90 miles of road, and at another time demanded 25 cents per mile for each time his stages passed the road. He received a notice from

John G. Winter, acting as agent for the company, stating that they would charge him for the use of the road; but he disregarded said notice, claiming the right to travel the road under said contract. The road was worth $20 per mile, subject to a deduction of 25 per cent. on the value of the use of the road, from the 15th January, 1854, up to this time; and for six or eight months prior to the 15th January, 1854, he claims a deduction of 10 per cent., for the bad condition of the road. The balance of the time the road was worth $20 per mile."

This answer being contested by the plaintiffs, an issue was made up between the parties; but at the next term, as appears from the bill of exceptions, "the court withdrew the cause from the jury, and proceeded to render judgment against the garnishee on his answer" for $1332 63; to which the garnishee excepted, and which he now assigns as error.

WM. P. CHILTON, and MORGAN & MARTIN, for the appellant, made the following points:

1. On motion for judgment on the answer, the answer must taken as true; and judgment cannot be rendered against the garnishee, unless the answer admits an indebtedness which the debtor himself might recover in debt or *indebitatus* assumpsit.

2. The demand in favor of the Central Plank-Road Company, disclosed by the answer, is not of such a nature as can be reached by process of garnisment.—Nesbitt v. Ware & McClanahan, 30 Ala. 68, and authorities cited.

3. The answer discloses a breach of contract on the part of the company, and that the garnishee only got possession of the road by virtue of an injunction bond, on which he is still liable. The company could not, under these circumstances, proceed to judgment against the garnishee, either upon the express contract, or upon an implied promise, until the determination of the injunction suit.

4. The abandonment of the road by the company, as alleged in the answer, no matter for what cause, threw the

road open to the public. The charter only authorized the company to charge toll when its road was kept in repair, and toll-gates established.

5. The act of 1854, under which the road was thrown open by the commissioners, is not obnoxious to any of the constitutional objections urged against it. The company was bound by its charter to keep the road in repair, "so as to afford a safe and convenient transit for persons or freight;" and yet the charter prescribed no remedy to be pursued, either by the State or an injured party, for a neglect of this duty. The act of 1854 only supplied this omission, and provided a summary remedy to enforce the duty undertaken by the company. This act does not affect the charter of the company, or any of its vested rights; nor does it impose any new duty or liability on it. It is analogous to a statute giving a summary remedy for the enforcement of an existing contract. The charter does not authorize the company to receive tolls when it fails to keep its road in repair; and there is nothing in the charter which could preclude the legislature from prescribing the mode of ascertaining when the road is out of repair. In support of these propositions, see the following analogous cases: 6 How. (U. S.) Rep. 507; 2 Ala. 452; 5 Cranch, 281; 10 Wheaton, 246; 6 Peters, 404; 8 Peters, 88; 2 Sandf. 355; 11 Ohio, 112; 16 How. (U. S.) Rep. 406; 9 Ala. 236.

L. E. PARSONS, *contra.*—1. The charter of the company conferred on it unlimited powers as to tolls.

2. This charter was accepted by the company, and large sums of money were expended on the faith of it. It thus became a contract, which the legislature could not, without the consent of the stockholders, violate or impair. 4 Peters, 514; 4 Wheaton, 537; 34 Maine, 415; 13 Iredell, 75; 10 Geo. 190; 2 Stewart, 30; 3 Cl. & Fin. 513, 521; 14 Barbour, 405; 27 Miss. 517; 13 B. Monroe, 150; 13 Vermont, 402, 525; 11 N. H. 19; 23 Ala. 68.

3. The act referred to in the answer of the garnishee, under which the gates of the company were thrown open, is unconstitutional and void, in that it attempts to take

away the vested rights of the company, without a trial by jury, without a judicial investigation, and without due process of law.—34 Maine, 247 ; 3 Mass. 146 ; 3 Pick. 343 ; 17 Johns. 195 ; 2 John. Ch. 162 ; 8 Sm. & Mar. 9 ; 15 Barbour, 517 ; 3 How. (Miss.) 240.

4. The answer admits an indebtedness sufficient to support the judgment, outside of the matters covered by the legal questions involved.

RICE, C. J.—It is settled, that a judgment for a sum of money cannot be rendered on the answer of a garnishee, against him, unless there is a distinct admission of a legal debt, either due, or to become due, by him to the defendant in the original suit, (Price v. Thomason, 11 Ala. R. 875 ; Mims v. Parker, 1 Ala. R. 421 ;) and that the only moneyed demands which can be reached by garnishment, are those which are of such a nature, that they might be recovered in an action of *debt* or *indebitatus assumpsit.*—Hall v. Magee, 27 Ala. R. 414 ; Nesbitt v. Ware & McClanahan, 30 Ala. R. 68 ; Mims v. Parker, *supra.*

It is also settled, that the garnishee may retain for any debt which he shows to be due to himself from the defendant in the original suit, or for any damages which he may show himself entitled to recover out of him, and which arise out of the same transaction or contract in respect to which the plaintiff in garnishment is seeking to make the garnishee liable. In respect to such debts or damages, the garnishee may protect himself to the same extent as he might if the suit was, in fact, a suit against him in the name of the defendant in the original suit. Hazard v. Franklin, 2 Ala. R. 349, and cases cited *supra;* Bingham v. Rushing, 5 Ala. R. 403 ; Reps. of Thomas v. Hopper, *ib.* 442. A resort to the remedy of garnishment cannot deprive the garnishee of the benefit of *recoupment,* or of any like defense.—Faxon v. Mansfield, 2 Mass. Rep. 147 ; Peden v. Moore, 1 Stew. & Por. 71.

By the charter granted to the Central Plank-Road Company, by the legislature of this State, on the 30th January, 1850, (Pamph. Acts of 1849–50, pp. 268–272,) the company was invested with all the rights and powers

necessary or required for the construction, continuation and keeping up a plank-road from Wetumpka to Gunter's Landing, or such other eligible point or place on the Tennessee river as might be selected. The president and directors of the company were authorized by the charter "to agree upon and fix the rate of toll to be collected and received of any person or persons" who might travel on or use the said road, and to cause to be erected upon said road "*suitable gates for the detention of persons passing thereon until the toll required*" had been paid. In the act of incorporation there was no clause reserving to the legislature the power to destroy by any subsequent statute any right legally vested in the company by its charter.

An act was passed at the session of the legislature of 1853-4, (Pamph. Acts of 1853-4, pp. 51-53,) the first four sections of which are, in substance, as follows:

SEC. 1. "That, from and after the passage of this act, it shall be the duty of the judge of probate of each county in this State, through or into which any plank, macadamized or turnpike road may run, to appoint three discreet freeholders of the proper county, commissioners, who shall hold their offices for one year, and until their successors are appointed, and shall perform the duties hereinafter specified.

SEC. 2. "That upon the application of any two freeholders or householders, any two of said commissioners shall proceed to examine the condition of any plank, macadamized or turnpike road within their county; and if, upon such examination, it shall appear to said commissioners that any such road is out of repair, so as not to afford a safe and convenient transit for persons or freight over such road, it shall be their duty to throw open the toll-gates of such road, and, without delay, make return of such examination and action thereon, under oath, to the judge of probate of the proper county.

SEC. 3. "That whenever any proprietor or authorized agent of any road, which has been examined and declared out of repair, as provided for in this act, shall make application to such commissioners for that purpose, said commissioners, or any two of them, shall proceed to examine

any such road as has been reported out of repair; and if, upon such examination, such road shall be found in proper order and repair, they shall forthwith report that fact to the judge of probate, under oath; and as soon as such return shall be made by the commissioners, the proprietor or authorized agent of any such road shall be authorized to receive toll, as before, for passing over such road.

SEC. 4. "That if any gate-keepers, or other persons, after any such road is declared out of repair, as provided for in this act, and before the same has been examined and reported upon by the commissioners, shall charge or receive any toll from any person for passing over or upon such road, or upon any freight or produce carried over or upon such road, such gate-keeper or other person receiving or charging such toll shall be liable for five times the amount of such toll, and costs, to be recovered before any justice of the peace of the proper county; and in any such suit the plaintiff shall be a competent witness."

Under color of these sections of the act of 1853–4, the gates of the company, erected and used for the detention of persons passing on the plank road until the toll required had been paid, were thrown open. This throwing open of the gates is one of the facts or matters stated and relied on in the answer of the garnishee; and thus it becomes our duty to pass upon the constitutionality of those sections.

The legislative charter to the Central Plank-Road Company was accepted, and the company organized under it. It is a contract within the meaning of the constitution of the United States, the obligation of which the legislature had no power to impair. The right of the company to receive and collect toll at their gates, erected in conformity to the charter, is a franchise, and is undoubtedly private property. Among the means by which the company exercised and enjoyed their franchise, were their gates. The sections of the act of 1853–4, above copied, if valid, take away the franchise, or part of it, without compensation, without a trial by jury, without due process of law, and evidently impair the obligation of the contract, created by the charter, between this State and the company.

Beyond all question, these sections of that act are, as to the Central Plank-Road Company, unconstitutional and void.—Bank of the State v. Bank of Cape Fear, 13 Iredell, 75; New Orleans, Jackson and Great Northern R. R. Co. v. Harris, 27 Mississippi Rep. 517; Matter of Hamilton Avenue Brooklyn, 14 Barb. Sup. Ct. Rep. 405; Constitution of United States, Article I, § 10; Constitution of Alabama, Article I, §§ 10, 13, 28; Baugher v. Nelson, 9 Gill's R. 299.

As these sections are unconstitutional and void as aforesaid, the throwing open the gates of the Central Plank Road-Company, under them, did not, *per se,* alter or affect the duties, rights or relations between the garnishee and that company, then existing and arising under or out of a valid contract previously made between them. The contract between the company and the garnishee, mentioned in his answer, and the obligations and rights of the parties under that contract, were not in the least changed or affected by the aforesaid throwing open of the gates.

One of the obligations implied by law from that contract, as set forth in the answer of the garnishee, was, that the company would keep their road, and every part of it, in good order for the period covered by the contract. If they did not keep every part of it in such order, their failure to do so was a breach of their contract, which could not be excused by the throwing open of their gates by the commissioners under the act of 1853–4 above cited. Another obligation of the contract was, that the stages of the garnishee, during the period covered by the contract, should not in any manner be obstructed or hindered by the company in running or passing on the road. Any such obstruction or hinderance was a breach of the contract. Any such breach of the contract on the part of the company gave to the garnishee the election to abandon the contract, or to hold on to the contract, and claim the damages resulting to him from such breach, and also a deduction from the contract price of so much as the running his stages on the road was worth less on account of such breaches. The company cannot be permitted to

gain by their fault in violating the contract.—Hayward v. Leonard, 7 Pick. R. 181; Dubois v. Delaware & Hudson Canal Co., 4 Wend. R. 285; Jewett v. Weston, 11 Maine R. 346; Smith v. Smith, 1 Sandf. S. C. R. 206; Liggett v. Smith, 3 Watts' R. 331; Thornton v. Place, 1 Moody & Rob. 218; Ritchie v. Atkinson, 10 East's R. 296; Taft v. Montague, 14 Mass. R. 282; 2 Greenl. on Ev. § 104.

It seems from the answer of the garnishee, that before the period covered by the contract had expired, the company abandoned the road, and had no agent on the road to receive or claim toll. After such abandonment, and during its continuance, the company is not entitled to recover toll, unless under an express contract. The law will not imply a promise to pay toll on the part of a person passing on the road, during such abandonment. By accepting the charter, an obligation was cast upon the company to provide agents, and keep them on the road ready to receive toll from all who were ready and willing to pay it. It is essential to their right to toll, upon the idea of an *implied* contract to pay it, that they should first furnish to persons using the road this easy and convenient opportunity for paying it.

The counsel for the appellee contends, that the charter conferred on the company "an unlimited power as to tolls." It is not absolutely necessary, in this case, for us to decide that question. But we wish to be understood as not assenting to the position taken by the counsel. Such franchises are restrictive on the public; and, when they are granted in such general terms as are employed in the charter shown in this case, the words are to be construed most strongly in favor of the public. We cannot think the legislature intended by the words employed, to confer upon the company the power to fix an *unreasonable* rate of toll, or to collect *unreasonable* toll. The charter does not *express* any such intention. Many charters confer, in general terms, the power to pass by-laws; yet the courts have often pronounced by-laws void, because they were *unreasonable*. Why may not the courts exercise a similar power, in case palpably *unreasonable* toll is demanded?—See Wales v. Stetson, 2 Mass. Rep. 143;

Chadwick v. Moore, 8 Watts & Serg. 49; Baugher v. Nelson, *supra;* Islington Market Bill, 3 Clarke & Fin. 513; 2 Wend. Bl. Com. 38, note, (53.)

We have said enough to show that the judgment of the court below is erroneous, and prejudicial to the garnishee. The views above expressed will probably enable the court below to determine what judgment should be rendered upon the answer, in case the contest pending upon it shall be decided in favor of the garnishee. The pendency of that contest is enough to prevent us from rendering the proper judgment on the answer. All we can do, is to reverse and remand.

Judgment reversed, and cause remanded.