# DOCKERY vs. McDOWELL.

[FINAL SETTLEMENT OF ADMINISTRATOR'S ACCOUNTS.]

1. *Receipt of Confederate money by administrator, and investment in Confederate bonds.*—Under the provisions of the act of the legislature approved on the 9th November, 1861, (Session Acts, 1861, p. 53,) an administrator was authorized, during the war, to receive treasury-notes of the Confederate States in payment of debts due the estate; and if he invested such treasury-notes, prior to the expiration of eighteen months from the grant of his letters, in four-per-cent. Confederate bonds, and failed to report such investment to the probate court within the time required by the statute, he is not chargeable on account of the investment, at the instance of distributees or creditors, except on affirmative proof of consequent injury to the estate, and only to the extent of that injury. (BYRD, J., *dissenting*, held that the said act of November 9, 1861, did not authorize an investment in four-per-cent. bonds; that such investment, not being authorized by law, was not ratified by the ordinance of the State convention, No. 26, adopted on the 28th September, 1865; that the administrator was chargeable, at the instance of the distributees or creditors of the estate, with the amount of funds so invested, as for any other unauthorized conversion of the assets; and that the subsequent act of the legislature, approved on the 23d February, 1866, could not legalize it.)

2. *Compensation of administrator on receipts and disbursements.*—Under the statute regulating an administrator's commissions on receipts and disbursements, (Code, § 1825,) his per-centage on receipts in Confederate money, during the war, should be allowed out of the Confederate money remaining in his hands at the time of the settlement; on disbursements in such funds, during the war, his per-centage should be calculated on the basis of the benefit to the estate by the disbursements; and on receipts and disbursements in United States currency, since the war, the per-centage should be allowed in that currency.

3. *Allowance for special or extraordinary services.*—An administrator is not entitled to an allowance for "special or extraordinary services,"

Dockery v. McDowell.

(Code, § 1825,) on proof that, while in an adjoining county on other business, he made inquiry in relation to the evidence in two suits there pending against the estate, and in relation to the witnesses by whom certain facts could be proved, and had several conversations with his attorney in reference to the suits.

APPEAL from the Probate Court of Wilcox.

IN the matter of the final settlement of the accounts and vouchers of John R. McDowell, as the administrator of the estate of William W. Robinson, deceased. Letters of administration on the estate of said decedent were granted to said McDowell, on the 15th July, 1863. A petition by the administrator for the sale of certain personal property belonging to the estate, at the salt-works in Clarke county, for the payment of debts, and an order of sale founded on the petition, are copied into the transcript immediately after the order granting letters of administration to McDowell; but both are without date. On the 1st August, 1863, the administrator filed an inventory and appraisement of the property in Clarke county, and a return of the sale of the property; both of which were ordered to be recorded. On the 6th August, 1863, the administrator filed a petition asking for an order to sell all the personal property belonging to the estate in Wilcox county, except slaves, for the payment of debts; and an order of sale was granted on the same day. On the 17th August, 1863, the administrator filed another petition, asking an order for the sale of kettles, furnaces, &c., at the salt-works in Clarke county, for the payment of debts; and an order of sale was granted on the same day. On the 20th August, 1863, the administrator filed an inventory and appraisement of the property of the estate, which purports to have been made by appraisers previously appointed. On the 26th October, 1865, the administrator reported the estate insolvent; and on the 11th December, 1865, it was so declared by the court, without any contest on the part of the distributees or creditors, and the administrator was ordered to file his accounts and vouchers for a final settlement on the second Monday in February, 1866.

The administrator having filed his accounts and vouchers, and objections to the allowance of several of the items

30

specified in the account having been filed by C. J. Dockery, one of the creditors of the estate, the case was finally heard on the 26th March, 1866. On the hearing, as the bill of exceptions states, the administrator asked a credit for the sum of two thousand dollars, as per voucher No. 57 in his account-current, which was a certificate issued by the Confederate States depository at Selma, on the 12th March, 1864, in these words: "This will certify, that the estate of W. W. Robinson has paid in at this office *two thousand dollars*, for which amount registered bonds of the Confederate States of America, bearing interest from this date at the rate of four per cent. *per annum*, will be issued to' him, under the 'act to reduce the currency, and to authorize a new issue of notes and bonds,' approved February 17, 1864, upon the surrender of this certificate at this office." To the allowance of this voucher, as a credit to the administrator, said Dockery objected, " on the following grounds : 1st, because there was no order of court, allowing or authorizing the investment of the moneys of said estate in such way ; 2d, because said administrator did not report said investment to the court having jurisdiction of the estate he represented, within sixty days after the investment ; 3d, because the laws of Alabama, authorizing or allowing the investment of funds belonging to estates in Alabama, in bonds of the Confederate States, or in four-per-cent. certificates of the Confederate States, or in any bonds or certificates of the Confederate States, are contrary to the laws of the United States, and null and void." " The said voucher itself," the bill of exceptions states, "was the only evidence offered in its support, and all the evidence offered on the question of its allowance. " The court thereupon overruled said Dockery's objections to the allowance of said voucher, and allowed the administrator a credit for two thousand dollars as claimed; to which said Dockery reserved an exception. " It was agreed, however, that the property of the estate was sold by the administrator for Confederate money."

" The administrator moved the court to allow him the sum of five hundred dollars, in the present currency of the country, commonly called 'greenbacks' and 'national cur-

rency', for his commissions as administrator on said estate; to which said Dockery objected; but the court overruled his objections, and made said allowance of five hundred dollars for commissions to said administrator; to which ruling and allowance said Dockery excepted."

"The administrator asked the court for an allowance of one hundred dollars, for special and extraordinary services rendered the estate; and, to sustain his motion for such allowance, introduced S. G. Cochran as a witness, who testified, that there were two suits pending in the circuit court of Wilcox against said John R. McDowell, as administrator of said estate; that while said administrator was in Clarke county, on other business, he made inquiry in relation to the evidence in said causes, and in relation to the witnesses by whom certain facts in the causes could be proved; that said administrator had several conversations with witness in relation to said causes; and that said causes had never been tried, but are still pending in said circuit court. This being all the evidence offered in relation to said claim of one hundred dollars for special or extraordinary services, the court allowed the same; to which the said Dockery excepted."

The final decree of the court, after stating the necessary preliminaries, proceeds thus: "Upon which auditing and examination it appears, that said administrator has received of the assets of said estate, in Confederate States currency and securities, the sum of seventeen thousand seven hundred and sixteen 54-100 dollars; and that he has legally and justly expended for said estate, in Confederate currency, the sum of ten thousand three hundred and fifty-nine 98-100 dollars, leaving a balance in his hands, in said Confederate States currency, of seven thousand three hundred and fifty-six 54-100 dollars, for which he is credited; that he has also received, and is chargeable with, the further sum of eight hundred and forty-eight 64-100 dollars, in 'greenbacks', or 'national currency', and has legally and justly expended for said estate, in the same currency, the sum of eleven hundred and fifty-five 13-100 dollars, for which he is credited; leaving a balance due said John R. McDowell, from said estate, of three hundred and six 49-100

dollars, in national currency, which amount said John R. McDowell is hereby adjudged to be entitled to recover from said estate, and for which let execution issue as the law directs."

The several rulings of the court to which exceptions were reserved, and the final decree, are now assigned as error.

S. J. CUMMING, for appellant.

PETTUS & DAWSON, contra.

A. J. WALKER, C. J.—Upon the principles settled in the case of *Neilson v. Cook*, at the present term, the administrator had authority to receive Confederate treasury-notes. His investment in four-per-cent. bonds, for which he received the certificate entitling him to the bonds, it is contended, should have been reported according to the terms of the 4th section of the act of 9th November, 1861.— Pamphlet Acts, p. 53. If that be admitted, it can not affect the result; for, before the administrator could be charged on account of the investment of Confederate treasury-notes in that way, it should appear that the estate was injured thereby. This does not appear to our satisfaction. The administrator was not required to pay the debts of the estate until eighteen months had expired, and that period did not expire until the 15th January, 1864. The case must be reversed upon another ground; and if it should appear, upon a future trial, that the estate sustained detriment by the investment in four-per-cent. bonds, and that the investment was not reported as required by the statute, then the administrator should be charged, to the extent of the damage. We can not distinguish between an investment in four-per-cent. certificates, and an investment in bonds. The money was paid for the bonds, and the certificates were issued as evidence of the right to the bonds, which were to be delivered at a future time.

2. We think the statutes regulating the compensation of administrators by two and a half per cent. on receipts, means two and a half per cent. of that which was received. If the administrator, at the time of settlement, had on hand Confederate money, he should have been allowed an

amount equal to two and a half per cent. of the Confederate money received by him, out of the Confederate money so on hand. Upon the disbursements of the Confederate money, the equitable and just rule (and we therefore adopt it) is, that he should be allowed two and a half per cent. upon a sum equal to the value of the benefit bestowed upon the estate by the disbursement. Upon the receipts and disbursements of United States currency, the administrator was entitled to two and a half per cent. out of that currency.

3. Upon the facts proved, the administrator was not entitled to any thing for special or extraordinary services.

In so far as the rulings of the court below vary from the principles above stated, they are erroneous.

Reversed and remanded.

BYRD, J.—It is a fundamental principle of the common law, well and firmly supported by reason and authority, that the legislative department of the government cannot divest a citizen of a *lawfully* acquired right or title to property; and the maxim, *nemo potest mutare consilium suum in alterius injuriam,* is a principle of the *common* as well as the *civil* law; and is applicable, in a free government, as well to the government as to individuals.

This principle, and the application I shall make of it to the facts of this cause, are sustained by the reasoning and authority of the following adjudications and references:

Bracton, lib. 4, fol. 228; 2 Inst. 292; 1 Black. Com. 41, 91, 161–2; 1 Fonb. Eq. ch. 1, § 3; Story on Const. § 1399; 1 Bish. Mar. & Div. 776–84; 10 Mod. 115; *Gilmore v. Shuter,* 2 Lev. 227; 3 Rep. 118 *a*; *City of London v. Wood,* 12 Mod. 637; 1 Kent's Com. 448–508; *Day v. Savage,* Hob. 87; *Bonham's case,* 8 Rep. 115; *Wilkinson v. Leland,* 2 Peters, 657; 8 Wheaton, 493; *Ogden v. Blackledge,* 2 Cranch, 272; *Dash v. Van Kleeck,* 7 John. 447; *Ham v. McClaws,* 1 Bay, 93–8; *Bowman v. Middleton,* 1 Bay, 152; *Commonwealth v. Worcester,* 3 Pick. 462–72; *Bates v. Kimball,* 2 D. Chip. 77–89; *Medford v. Learned,* 16 Mass. Rep. 215–17; *Calder v. Bull,* 3 Dal. 386; *Cochran v. Van Surley,* 20 Wendell, 365–73; *Varick v. Smith,* 5 Paige, 157–9;

*Bloodgood v. Railroad,* 18 Wend. 9–56; *Taylor v. Porter,* 4 Hill (N. Y.) 140; *Williams v. Robinson,* 6 Cush. 333; *Van Horne v. Dorrance,* 2 Dal. 304; *Goshen v. Stonington,* 4 Conn. 209–25; *Merrill v. Sherburne,* 1 N. H. 199–213; *Lyman v. Mower,* 2 Verm. 517; *Ward v. Barnard,* 1 Aiken, 121–7; *University v. Williams,* 9 Gill & J. 365; *Sharp v. Bykerdyke,* 3 Dow. 102; *Fletcher v. Peck,* 6 Cranch, 87, 135; *Wheat v. The State,* Minor, 199; *Taylor v. Rushing,* 2 Stew. 160; *ib.* 228; 2 Stew. & Por. 199; 2 Ala. 54; *Bloodgood v. Camack,* 5 Stew. & Por. 267; 15 Ala. 730; *Weaver's Ex'rs v. Weaver's Creditors,* 23 Ala. 789; *Walker v. Chapman,* 22 Ala. 116; *Mays v. Williams,* 27 Ala. 267; 23 Ala. 168; *Steamboat Company v. Barclay et al.,* 30 Ala. 120; 31 Ala. 552; *Tenn. R. R. Co. v. Moore,* 36 Ala. 371; 19 Ala. 438; *Falconer v. Campbell,* 2 McLean, 195; *Sutherland v. DeLeon,* 1 Texas, 250.

These authorities are not harmonious; but giving them all a fair consideration, I adopt the principle above announced, and make the application of it to the facts of this case, as is hereinafter made.

In the case of *Dash v. Van Kleeck, (supra,)* Kent, C. J., says : "It is a principle in English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect."—1 Black. Com. 161–2. In the same case, he further says : "It is not pretended that we have any express constitutional provision on the subject ; nor have we any for numerous other rights dear to freedom and to justice. An *ex-post-facto* law, in the strict technical sense of the term, is usually understood to apply to criminal cases; and this is its meaning when used in the constitution of the United States ; yet laws impairing previously acquired civil rights are equally within the reason of the prohibition, and equally to be condemned. We have seen that the cases in the *English* and *civil* law apply to such rights ; and we shall find, upon further examination, that there is no distinction in principle, nor any recognized in practice, between a law punishing a person criminally for a past innocent act, or punishing him civilly by divesting him of a lawfully acquired right."

In the case of *Ogden v. Blackledge, (supra,)* the court con-

sidered the point too plain for argument, that a statute could not retrospect so as to take away a vested civil right." See, also, *Bowman v. Middleton, supra.*

The constitution of the United States prohibits any State from passing a law impairing the obligation of contracts; and by the 5th article of the amendments thereto, it is expressly provided, that "private property shall not be taken for public use, without just compensation." I cannot see how, in the face of these fundamental guaranties, private property can be taken for private use, or how vested rights to property can be divested, or abrogated, by the legislative department of the government. If the obligation of contracts is so carefully and sacredly guarded by the Federal and State constitutions, certainly the vested right which the owner has to the property conveyed by a contract is equally well protected; as well after as before the property is reduced to actual posession. It would be a singular anomaly if it is to be held that the obligation of a contract cannot be impaired by the legislative department, and yet it is competent to impair or destroy *the right* to the chose in action, or other thing transferred by the contract, after being reduced to possession. If private property cannot be taken for public use, it cannot for private, without just compensation.

If, in the regulation of the remedy, the collection of a pre-existing debt is unnecessarily delayed, impairs the obligation of a contract, as some high authorities hold, would it not be monstrous to hold that the vested right of the contract *itself*, or any chose in action, could be impaired or abrogated by the legislature? I hold that there is a broad line between its power over the regulation of the remedy and use of property, and its power to impair or defeat the right to property. The first power exists, the latter does not; and the only difficulty about that line is in ascertaining what is matter of remedy, and what of right. A State convention is not competent to violate the constitution of the United States, or deprive any one of the guaranties of that supreme law of the land.

Upon the grant of letters of administration, the legal title to the personal property of the deceased, within the

jurisdiction, is vested by law in the administrator; but the distributees have a vested beneficial interest in such property, subject to the rights of creditors and costs of administration; and such interest is several and not joint, and may be transferred or assigned by each before distribution. *Maury's Adm'r v. Mason's Adm'r*, 8 Porter, 233; *Br. Bank v. Wade*, 13 Ala. 429; *Gould v. Hayes*, 19 Ala. 438; 16 Ala. 494; 11 Ala. 613; 25 Ala. 285; 33 Ala. 57.

It was held in *Weaver's Ex'rs v. Weaver's Creditors, (supra,)* by this court, that an executor had no vested right, *personal to himself,* in the office of executor, which would prevent the legislature from enacting a law, the effect of which, in the case of the insolvency of the estate, would deprive him of such office; but, at the same time, the court held, that he could not be deprived by statute of a vested personal right. This being so, it certainly results that the creditors, distributees, or legatees, could not be deprived of their rights or interest to or in the estate, by legislative enactment. It is true that, in the one case, the law alone may confer the right, and in the other the will of the testator and the law; but this can make no distinction—the rights of each are equally sacred and inviolable.

In the case of *Society, &c., v. New Haven,* (8 Wheaton, *supra,)* Justice Washington, delivering the opinion of the court, says: "If, for example, a statute of descents be repealed, it has never been supposed that *rights* of property already vested during its existence were gone by such repeal. Such a construction would overturn the best established doctrines of law, and sap the very foundation on which property rests."

So far as the case of *Bryan et al. v. Weems,* (21 Ala.) is in conflict with these views, it is not held by me as authority on the question under consideration.

The appellee relies upon the fourth section of an act approved February 23d, 1866, (Pamphlet Acts, 114,) to sustain the allowance by the court below of voucher No. 57 as a credit to him. The credit claimed was a four-per-cent. Confederate States certificate, for two thousand dollars, in which the funds of the estate had been invested. If the administrator made the investment under the authority of

the act of the 9th November, 1861, (Pamphlet Acts, 1861, p. 53,) he failed to show that he had complied with the provisions of that act. But that act does not authorize an investment in *four-per-cent. certificates.* It can not be conceived that the legislature, by the act of 1861, intended to authorize an investment in four-per-cent. bonds or certificates, as no such bonds or certificates were then in existence, or authorized to be issued. The only bonds then issued, or authorized to be issued, were bonds bearing eight per cent. interest, and the legal rate of interest by the State law was eight per cent. He is, then, forced to rely upon the act of 1866, referred to above, or the 26th ordinance of the State convention of 1865. The latter requires, not only that the act should be done under color of law, but in good faith, and in pursuance of law, to entitle the party to its protection; and I have shown that it was not done in pursuance of law, or color of law, nor was there any evidence that it was done in good faith; though, if the law had been complied with, the court *might* presume that the investment was made in good faith. However this may be, for I do not intend to intimate any opinion on the question, I am satisfied that the ordinance affords no protection to appellee.

The investment not having been authorized by law at the time it was made, it can not, by a subsequent act of the legislature, be so legalized as to deprive the creditors and distributees of their right to the money so invested, or to hold the administrator liable for its conversion, even if it was Confederate money; for a conversion of anything belonging to an estate, by the trustee, implies injury—the amount alone must be proved. Such a result would be in conflict with the principle, or maxim, *nemo potest mutare*, and the precedents furnished, in the above adjudications referred to, for its application.

Neither the act of 1861, nor any subsequent act, authorized the appellee to invest in four-per-cent certificates, or any other certificates. Nor does the act of 1866 ratify or attempt to ratify an investment in such certificates.

Whether the appellee should account for, or be charged with, the two thousand dollars so invested, I intimate no

opinion.   That will depend upon facts which, perhaps, are
not shown by the record; but may be on another trial in
the court below.

The conformity of the acts, passed by the State legis-
lature during the late war, authorizing the investment of trust
funds in Confederate bonds, to the national constitution,
does not lie across the line of my argument, and I do not
deem it necessary to intimate any opinion upon that very
grave and interesting question.   The main question is,
whether voucher 57 is a legal credit in favor of the appellee;
and I hold that it is not, *even* if those acts were valid and
constitutional.   And I further hold that the act of 23d
February, 1866, gives no validity to that voucher.

My brethren agree with me in the result, but upon other
grounds, as stated in their opinion.   The decree of the
probate court is reversed, and the cause remanded.