# NEILSON vs. COOK.

[FINAL SETTLEMENT OF GUARDIAN'S ACCOUNTS.]

1. *Receipt of Confederate money by guardian.*—Under the provisions of the act of the legislature approved on the 9th November, 1861, (Session Acts, 1861, p. 53,) a guardian was authorized, during the war, to receive treasury-notes of the Confederate States in payment of debts due to his ward's estate.

2. *Same.*—The same principles do not apply to a receipt of such treasury-notes by a guardian on the 7th May, 1865, at which time the government *de facto* in Alabama had been overthrown, and the authority of the United States had been re-established; and there being no legal justification for such receipt, the guardian is chargeable on account of it on final settlement.

3. *Exchange of bank-bills for Confederate money.*—A guardian being authorized to exchange one kind of currency for another, and being justified in yielding obedience, during the war, to the government *de facto* which existed in the State, and in dealing in Confederate States treasury-notes, which constituted the common currency of the country at that time; to make him liable on account of an exchange of bank-bills for such treasury-notes, it must be shown that he acted as a prudent man would not have acted in the management of his own affairs, and that his ward's estate was thereby injured; and he is only liable to the extent of that injury.

4. *Liability for hire of slaves.*—The failure of a guardian, in hiring out his ward's slaves, to require a note with sureties from the hirer, being contrary to the general usage, and also violative of section 1751 of the Code, (if that section is applicable to guardians,) he is chargeable with the amount of the hire, on final settlement of his accounts, if it appears that there is danger of loss to the estate on account of the debts; but there is no warrant in the law for decreeing that the guardian "shall stand as security for the debts."

5. *Compensation, and how determined.*—Neither the failure to make annual settlements of his accounts, nor mere negligence which works no injury to the ward's estate, where *mala fides* is not shown, is sufficient to deprive a guardian of the right to compensation; but, where no special or extraordinary services are shown, the court is limited, in making the allowance, to the per-centage specified in the statute, (Code, §§ 1825, 2039,) and can not be governed by the testimony of witnesses as to the value of the services.

6. *Allowance of attorney's fee.*—Held, on the authority of the case of *Anderson v. Anderson*, (37 Ala. 683,) that there was no objection to the allowance of an attorney's fee of one hundred and fifty dollars to the guardian in this case; many of the contested items in his account being decided in his favor.

APPEAL from the Probate Court of Tuskaloosa.

IN the matter of the final settlement of the accounts and vouchers of Chelsea M. Cook, as guardian of John H. Neilson, a person of unsound mind. The letters of guardianship were granted on the 13th December, 1861; and the final settlement was made, after several continuances, on the 8th January, 1866. The ward was represented on the settlement by Mrs. Mary Neilson, his wife, who had made application for letters of guardianship of his person and estate under the authority of a special act of the legislature, and also by attorney. The bill of exceptions purports to set out "all the testimony relating to the matters, opinions, and proceedings of the court, excepted to"; the material portions of which may be thus stated:

1. "Mrs. Neilson requested the court to charge said Cook with the value of eight hundred dollars in bills of the Bank of Mobile," (which he had exchanged for treasury-notes of the Confederate States, as hereinafter stated,) "giving him the benefit of what he received for it; which the court refused to do, and charged him only with the Confederate notes, as stated in his account; to which Mrs. Neilson excepted." The evidence in relation to this item was as follows: "Samuel R. Hamner, a witness for said Cook, stated, that he and John McCollum were the executors of James C. Spencer, deceased, who was the guardian of said John H. Neilson before said Cook; that on their settlement of the accounts of said Spencer as such guardian, with said court, in March, 1862, it was found that, besides negroes, notes, and other property in hand, there was a cash balance due from said Spencer's estate of $1918.13; and that soon afterwards, in pursuance of the orders of said court, said executors turned over to said Cook, as guardian, the notes and other property on hand, and paid him the said cash balance—that is to say, one thousand dollars thereof in notes on the Bank of Mobile, and the balance in notes on individuals. How many of these notes there were, or who were the makers, or when or how they were paid, or what became of them, was not in proof. Said Cook then read in evidence the deposition of George H. Kirk," whose tes-

timony was in these words : " In the latter part of December, 1862, or the early part of January, 1863, I purchased of C. M. Cook eight hundred dollars in notes of the Bank of Mobile, and five hundred and twenty-five dollars in Selma and Montgomery money, for which I paid him a premium of five hundred dollars in Confederate money, making in all eighteen hundred and twenty-five dollars in Confederate money. The premium I paid him was in excess of the market value in Tuskaloosa. Mr. Cook was trying to dispose of the money for several days, in order to obtain the highest premium for it; and at the time I purchased it, it was more than he could obtain from any one else in Tuskaloosa. Some days after purchasing from Mr. Cook, I purchased of John McCollum, as administrator of J. C. Spencer, twelve hundred and odd dollars of notes of the Central Bank, at twenty-five per cent. premium. I was acquainted with the value of the Bank of Mobile money, and the money of the other banks in the State; and the price I paid Mr. Cook was several per cent. higher than the market price in Tuskaloosa. I do not know what that money was worth in Mobile at that time; but I sold the same money in Selma, about three weeks afterwards, at sixty per cent. premium for the Mobile money, and thirty-five per cent. premium for the Selma and Montgomery money."

"Dr. Robert Neilson, a witness introduced by said Cook, testified that, from 1862, until the surrender, Confederate money was the common currency of the country; that the Mobile banks suspended specie payments, to the best of his recollection, in the winter of 1862–3,—it might have been in 1861–2; that their bills continued good for a long time after their suspension ; that there was no time during the war, when their notes were worth less than half as much as gold; that at one time he knew of nine dollars in Confederate money being given for one dollar in Mobile money, and at another time ten for one, but could not remember when." "Thomas Maxwell, introduced by Mrs. Neilson, testified that, in August, 1862, he returned from Europe, and bought Confederate treasury-notes at the rate of ten dollars for a sovereign ; that Mobile bank-notes, in the lat-

Neilson v. Cook.

ter part of 1863, rated with gold at fifty cents on the dollar; that this comparative value continued till within two or three weeks of the surrender, when he bought European exchange from the Bank of Mobile, rating its notes in that way. Mr. Maxwell further said, in answer to questions by said Cook, that the value of Mobile money was not known to the public, and he concealed it; that he bought it to make money, and did not pay its real value; that he knew of said Cook's offering for several days eight hundred dollars about the time he sold that sum to Kirk; that he tried to buy it from Cook, but offered him less than Kirk gave; that he was anxious to buy, knowing its value, but would not give as much as Kirk gave, which was more than the market price in Tuskaloosa."

2. "Mrs. Neilson requested the court to charge said Cook with the value of the note on John S. McCollum, and interest thereon, giving him the benefit of what he received; which the court refused to do, and charged him only with the Confederate notes, as stated in the account; to which Mrs. Neilson excepted." This note was for $1717.39, was dated the 14th August, 1860, and was proved to have been given for the price of land. On the 18th February, 1863, Cook collected $365.69 interest on it, in Confederate treasury-notes, and on the 9th March, 1865, the entire amount due on it ($2015.66), also in Confederate money; and he was charged in his account, as stated by the court, with both these sums. "It was admitted that, in June, 1863, McCollum spoke to Cook about paying his note in Confederate money, and that Cook told him he would not receive it; that again, not long afterwards, he brought the Confederate money to Cook to pay the note, and Cook again refused to receive it, because, as he said, he did not then need the money." Dr. Marrast, a witness introduced by Mrs. Neilson, testified, "that Confederate money was the common currency of the country during the war, and was received and paid out in current trades, and generally for debts created while it was in use; that so far as he knew or believed, it was not received in payment of debts created before the war, either in 1864 or 1865; that he offered to pay interest on an old debt, in 1864, in Confederate money,

and it was refused." "Dr. Róbert Neilson, being recalled at the instance of Mrs. Neilson, testified that, in March, 1865, in Tuskaloosa, Confederate treasury-notes rated at about sixty to one for specie." "T. F. Samuel, being recalled at the instance of said Cook, stated, that he, as sheriff of the county, received and paid out Confederate money, and no other, during his term; that he collected a good deal in 1864, but not much in 1865; and that he recollected one case—a State case—in which he received a fine at the March court, 1865." G. W. Jennings, introduced by said Cook, testified, "that he was the general administrator of the county, and had received and paid out Confederate money,—none, however, in 1865, and very little in 1864; that he paid to a firm in Mobile, some time in 1864, as administrator, six hundred dollars in Confederate money, on a debt due before the war; that said Cook, as his attorney, collected some in 1864, and paid it to him, but he did not recollect at what time; and that he thought he would have received it, if the debtor had brought it to him."

3. "Mrs. Neilson also requested the court to charge said Cook with the value of the note on D. A. Mitchell, (which was given for the hire of Lewis in 1862, and which said Cook collected on the 7th May, 1865, in Confederate notes,) allowing him what he collected; which the court refused to do, and charged him only with the Confederate notes, as stated in the account; to which Mrs. Neilson excepted." This item is entered in the account-current in these words; " May 7, 1865. To cash from D. A. Mitchell, hire of Lewis 1862, and interest, $103.25." Another item on the debit side of the account is, "Cash received from D. A. Mitchell, hire of Lewis, 1863, $100 ", and is dated January 1, 1864. " T. F. Samuel, a witness for said Cook, stated that, at some time not now remembered, he met said Cook and D. A. Mitchell on the street; that they told him Cook had a note on Mitchell for over one hundred dollars, which was not produced; that, by agreement between them, Mitchell gave him one hundred and five dollars, in Confederate money, to pay the note when produced; that he paid the note about a week afterwards, and that the money was current at that time."

4. "Mrs. Neilson requested the court to charge said Cook with the value of the hire of the negro woman Edith, hired to Miss Harriet Barringer, for the year 1865, and also with the value of the hire of the negro hired to R. F. Knott for the year 1864; which the court refused to do, but, in the decree, ordered that said Cook should stand as security for said hire; to which refusal to charge him as requested Mrs. Neilson excepted." The bill of exceptions states that, "during the examination of his account, said Cook stated to the court that, on the 1st January, 1865, he had hired negroes to parties who refused to give their notes for the hire, but were willing to pay in currency at the time, and that he accepted the payment, and now asked the instructions of the court as to what and how he should charge himself on that account; and the court thereupon directed him to charge himself with the amount at that date, which he did, as shown in the account stated." In reference to these two items for the hire of negroes, the decree of the court is in these words: "Among the list of notes, &c., presented by said Cook as guardian, there is a note on R. F. Knott for three hundred dollars, dated January 2, 1864, and due the 1st January, 1865, given for negro hire for the year 1864; also, an account against Harriet Barringer for two hundred and fifty dollars, for the hire of the woman Edith for the year 1865; for which said note and account there is no security. Thereupon, it is ordered by the court, that said C. M. Cook be held liable as security for the said claims, or evidences of debt." The deposition of Harriet Barringer was taken by Mrs. Neilson, and was as follows: "About the 1st January, 1865, C. M. Cook, as guardian of John H. Neilson, hired a negro woman to me for the year 1865, at two hundred and fifty dollars, clothing, and taxes. I offered, either to pay him in advance, or to give him my note. He said that he preferred my note. This was on Saturday, the day before New-Year's-day. I had my pocket-book with me, with the Confederate money, and was ready to pay in advance when I made the offer. I was induced to make the offer, because when I applied to him for Edie, about a week before, he told me he had been taking pay in advance, and I preferred to pay in advance,

and told him so. I have never given my note. It was not applied for until after we had all heard of General Taylor's surrender. I then renewed the offer to pay in Confederate notes, but Mr. Cook said he would not take them." There was no evidence in reference to Knott's note, except the facts stated in the decree.

5. "Mrs. Neilson also objected to the allowance made by the court to said Cook, for his services as guardian, and to the amount thereof, and reserved exceptions to the over-ruling of her several objections." The compensation allowed to the guardian was—for the first year, ending December 13, 1862, three hundred and fifty dollars; for the second year, the same sum; for the third year, two hundred and fifty dollars; for the fourth year, up to April, 1865, sixty-six 66–100 dollars,—in all amounting to eleven hundred and sixty-six 66–100 dollars. On the question of compensation, "it was shown to the court, on the part of Mrs. Neilson, by the files of the court, that no inventory of the effects of said estate which had come into his hands, was filed by said Cook until to-day; that no report or account of his doings was ever filed until to-day; that he resigned the guardianship about the 20th April last, and asked the court to appoint a day for the settlement of his accounts; that the 11th day of May was first appointed for this purpose, but the settlement was then continued, at the instance of Mrs. Neilson. It was admitted that, from that time until the present, with the exception of a brief interval, said Cook was desirous of a settlement; but it was prevented by the state of the country, and other circumstances. It was admitted, also, that W. Moody, counsel for Mrs. Neilson, went to the office of the probate judge, about the 1st May, 1865, for the accounts and other papers in the cause; that, not finding them there, he went to Mr. Cook's office, and was told by Mr. Cook that he was making out the papers, and would hand them to him; that said Cook did hand to said Moody, some days afterwards, the inventory, reports of the hiring of negroes, and accounts purporting to be accounts for settlement in 1863 and 1864, which are herein copied; and that these papers remained in the hands of said Moody and Mrs. Neilson, until about

the 30th December, 1865, when they were returned to said Cook, at his request."

"Robert Neilson, a son of said John H. Neilson, a youth about nineteen years old, who was introduced as a witness on the part of Mrs. Neilson, testified, that there were eight negroes belonging to the estate, six men and two women; that the negroes came to his mother's house every Christmas, and remained there until they were hired out; that when persons who wished to hire came to his mother's, she sent them to Mr. Cook, who perfected the contracts, and took their notes; that Mr. Cook, so far as he knew, did nothing but hire out the negroes in this manner, and receive and pay out money; that said Cook bought a horse and saddle for witness; that Mr. Spencer, the former guardian, used to come to the house, and inquire about the wants of the family, and purchase their family supplies; that Mr. Cook bought nothing for the family; that the estate owned a tract of land in North Mississippi, which Mr. Spencer made two trips to look after, but Mr. Cook made none; that Cook wrote one letter to the agent there, who was appointed by Mr. Spencer. Said witness stated, on cross-examination, that Mr. Cook might have done many things that he did not know of; and reference was made to some items in the accounts, which he said he did not know anything about."

"T. F. Samuel, when recalled, was asked what the services of said Cook, as guardian, were worth; and answered, he supposed between three and four hundred dollars. Being told that the money received and paid out was mostly Confederate money, he said that would make a difference. G. W. Jennings, being asked what Mr. Cook's services were worth by the year, said, that he supposed they were worth between three and four hundred dollars; but that, if Mr. Cook had not done his duty, they would be worth less, say two hundred dollars. Neither Samuel nor Jennings heard the testimony as to Mr. Cook's services; but the accounts filed, the list of the notes filed, and the reports of hiring, were laid before them, and the prominent portions of the testimony were stated to them by counsel. Mrs. Neilson objected to the court's receiving testimony as to the value

of said Cook's services, and reserved an exception to the overruling of her objections."

6. " Mrs. Neilson objected, also, to the allowance made for counsel fees, and to the amount thereof; and her objection being overruled, she excepted." The allowance made for counsel fees was one hundred and fifty dollars. The only evidence in relation to this allowance is the testimony of J. M. Van Hoose and J. M. Martin, esquires, who were introduced as witnesses on the part of Cook. Van Hoose stated, " that an attorney's fee in this case was worth about two hundred dollars "; and Martin, " that, in this case, and in matters of litigation of this kind, the attorney's fee would be worth not less than two hundred dollars."

The several rulings of the court to which exceptions were reserved, as above stated, are now assigned as error.

W. MOODY, for appellant.—In the management of the funds commited to his charge, a guardian must look only to the interests of his ward. He has no right to be benevolent, or charitable, or patriotic, at his ward's expense. He can do no act, whatever may be his motive, to the injury of his ward. He is required to act with reasonable diligence, and to be vigilant in the discharge of his duties; and in matters of discretion, he must act as a prudent man would act in regard to his own affairs. He has no right to mingle the trust funds with his own, nor to speculate with them, nor to buy stock, notes, bills of exchange, uncurrent money, or any kind of property; and if he does any of these things, he is responsible for the consequences, at the election of his ward. These general principles are sustained by the following authorities : *Jackson v. Sears*, 10 John. 434; *Montgomery v. Givhan*, 24 Ala. 58 ½; *Harrison v. Mock*, 10 Ala. 185; *Cunningham's Adm'r v. Rogers*, 14 Ala. 149; *Blackwell's Adm'r v. Blackwell's Distributees*, 33 Ala. 61; *Kavanaugh v. Thompson*, 16 Ala. 826; *Lawson's Adm'r v. Lay's Executor*, 24 Ala. 187; *Tompkies v. Reynolds*, 17 Ala. 109; *Kyle v. Barnett*, 17 Ala. 306; *Hudson v. Helms' Ex'r*, 23 Ala. 585; *Royall's Adm'r v. McKenzie*, 25 Ala. 363-70. These principles are founded in the general policy of the

law, and preclude inquiry into the circumstances of each particular case.

1. Tested by these general principles, the guardian ought to have been charged with the amount of the notes on the Bank of Mobile, which he sold for Confederate money. This bank continued to pay specie for its notes long after the war began, and kept them at par long after it had suspended, by selling its European exchange for them. Its notes were always the best currency in the country, and always approximated a specie standard. These facts, so peculiar, so remarkable, so generally known, would be judicially noticed by the court, even if there was no positive proof of them. If the bank-notes sold to Kirk were the identical notes received from Spencer's administrators, (of which fact, if it be a fact. there is no proof,) the guardian was not authorized to make the exchange, unless some imperative necessity required it. No such necessity was shown; on the contrary, the account, as stated by the guardian himself, and other positive evidence in the case, shows that there was no necessity for the exchange—that the guardian had no need of Confederate money at that time, and that the exchange was a mere speculation on his part. Even if a necessity for the exchange had been shown, the guardian rendered himself liable for the consequences of the act, by mingling his own funds with the trust funds. The exchange of the Mobile, Montgomery, and Selma bank-bills, was one indivisible transaction, and there is no proof that the Selma and Montgomery bills belonged to his ward's estate.

2. McCollum's note was given before the war, for the price of land; and it was as good a note as could be made. It was paid in Confederate money, at par, on the 9th March, 1865, just one month before General Lee's surrender. No prudent man would have received payment under the circumstances. The testimony shows, that, in March, 1865, Confederate notes rated at sixty to one for specie, in Tuskaloosa; that they were not received in payment of old debts, and were only taken where the claim was considered desperate. The act of November 9, 1861, under which the receipt of this money is sought to be

justified, did not compel guardians, nor make it their duty, to receive Confederate money in payment of debts. If it had attempted to do so, it would have been violative of the tenth section of the first article of the constitution of the United States, which declares, that no State " shall make anything but gold and silver coin a tender in payment of debts, nor pass any law impairing the obligation of contracts." It simply allowed him to exercise a sound discretion in the receipt of such funds, and left his liabilities to be determined as before. The court must judicially know, too, that, at the time this act was passed, Confederate notes were at par—in fact, were the best currency in the country, and that they became greatly depreciated before this payment was made.

3. At the time Mitchell's note was given, bank-notes were the principal currency of the country, and were only a little below par as compared with specie. It was paid in Confederate money, at par, on the 7th May, 1865 ; which was three days after Taylor's surrender, eleven days after Johnson's surrender, and nearly a month after Lee's surrender. No principle of law can sanction the receipt.

4. The guardian should have been charged with the amount of the hire due from Knott and Harriet Barringer. In failing to require security, he violated the universal usage of the country, if no positive statute. Miss Barringer testifies, that she offered to pay in advance ; and the guardian should have received the money, and appropriated it to the benefit of the ward's estate. The order that the guardian should stand as security for these sums, practically amounts to nothing, for there is no process by which it can be enforced.

5. To determine the guardian's right to compensation, regard must be had to the condition of the estate when he received it, its condition when he gave it up, the nature of his services while he had charge of it, and their effect on the estate. When the estate went into his hands, it owned a large amount of good notes, nearly two thousand dollars in cash, and eight negroes, good field-hands, besides a tract of land, and it owed nothing. When he gave it up, it owed over two thousand dollars, and had nothing of value left,

except the land, with which he had nothing to do. The family was supported, meanwhile, by Mrs. Neilson's personal exertions, and out of her separate estate; and she received from the guardian, during the four years, only about four hundred dollars. No special or extraordinary services on the part of the guardian were shown; his principal acts consisted in the receipt of worthless money, and resulted in palpable injury to the estate. By his bad management, there has been a loss to the estate of at least eight thousand dollars in good money. If he was entitled to extra compensation for these services, ought it not to have been allowed out of the worthless funds on hand?

6. The court erred in allowing an attorney's fee.—*Anderson v. Anderson*, 37 Ala. 683.

S. A. M. WOOD, *contra*, and C. M. COOK, *pro se*.—1. The exchange of the bank-notes was within the general authority of the guardian, and was required by the necessities of the estate. Moreover, the bank-notes were sold for more than their market value, and no injury resulted to the estate.—1 Vesey, 193 ; 2 Johns. Ch. 26, 28 ; 2 Stew. & Port. 376 ; 15 Ala. 333 ; 4 Johns. Ch. 629 ; 18 Ala. 27.

2. The receipt of Confederate treasury-notes by the guardian, was authorized by law.—Session Acts, 1861, p. 53. The act of the guardian has been ratified by the State convention, and by the legislature. —Ordinance No. 26, adopted September 28, 1865 ; Session Acts, 1865–6, p. 115. As the notes were collected and paid out in the same currency, no injury to the estate could have resulted.—*Gaunt and Wife v. Tucker's Executors*, 18 Ala. 27.

3. There is no statute in the State which made it obligatory on the guardian to take a note with sureties for the hire of the slaves. If it were his duty to do so, he could not be charged with the amount of the hire, except on proof of loss to the estate ; which is not shown.—*Powell v. Powell*, 10 Ala. 900 ; *Craig v. McGehee & Armstrong*, 16 Ala. 41.

4. Only gross negligence, or willful default, resulting in loss to the estate, can deprive a guardian of the right to compensation.—*Darrington v. Darrington*, 32 Ala. 227 ; 31 Ala. 207 ; *Gould v. Hayes*, 19 Ala. 438 ; 14 Ala. 302 ;

32

10 Ala. 900 ; 7 Ala. 617 ; 9 Porter, 667. The mere failure to make annual returns, is not such negligence.—16 Ala. 41. The guardian had no authority over the land in Mississippi, and the probate court could confer none on him.— 13 Ala. 329 ; 22 Ala. 396.

5. The allowance of the attorney's fee was proper.— 24 Ala. 259 ; 24 Ala. 295.

A. J. WALKER, C. J.—The assignments of error present for revision the rulings of the court to which exceptions were taken. They are as follows : 1st, the refusal to charge the guardian, "giving him the benefit of what he received", with the value of a note on John S. McCollum, given in August, 1860, which was collected in Confederate treasury-notes, on the 9th March, 1865 ; 2d, a like refusal to charge as to the value of the note on D. A. Mitchell, which was collected on 7th May, 1865, in Confederate treasury-notes ; 3d, the refusal to charge the guardian with the value of eight hundred dollars in bills of the Bank of Mobile, which were exchanged in January, 1863, at a premium, for Confederate treasury-notes; 4th, the refusal to charge the guardian with the value of a note on R. F. Knott, given for the hire of a slave in January, 1864, upon which there was no security ; and with the value of an account on Mrs. Barringer, for the hire of a slave for the year 1865, for which neither note nor security was taken ; and, 5th, the allowance of compensation and an attorney's fee.

1. We decide the question arising on the first of the above stated exceptions, in favor of the guardian, on the authority of *Watson and Wife v. Stone,* decided at the present term.

2. The note on D. A. Mitchell was collected in Confederate treasury-notes, after the surrender of the forces of the *de facto* government, and the establishment of the authority of the United States in Alabama. For this act there is no *legal* justification, and the guardian is chargeable, as proposed, by the appellant. He is, in fact, charged in the account with the amount of the note as money ; and as the account now stands, the result is the same as if a collection in par funds had been acknowledged ; but if, on stating a

future account, a balance should be ascertained against the guardian, the ruling now made, that the guardian had no legal right to collect the note in Confederate treasury-notes, may become important.

3. The refusal of the court to charge as requested in reference to the exchange, in January, 1863, of bills of the Bank of Mobile for Confederate treasury-notes, presents a different question. This transaction was not the payment of a debt, but an exchange. It is not authorized by the act of 9th November, 1861; for that act extends to payment in Confederate treasury-notes, and not to exchange for them. The liability on account of this transaction cannot be tested by the principles which govern as to the first point decided. There was nothing in the subsisting political *status* during the war, as between individuals, which forbade the use of Confederate money. The government being for the time without the sovereignty of the United States, individuals are excusable for yielding to the authority of the *de facto* government over them, and recognizing its attitude and position in reference to the United States. This is not only consonant with the principles of international law, but there was a long time during which the dealing in Confederate treasury-notes was an unavoidable necessity, for it was the only currency, and neither food, clothes, nor shelter could otherwise be procured. Guardians are allowed to make exchanges of one currency for another, when a prudent man, in the conduct of his own affairs, would have done so. The test, therefore, of the guardian's liability here is, whether he has acted as a prudent man, in the management of his own affairs, would not have acted, and whether the interest of his ward has been thereby prejudiced. If he did so, he should be held liable to the extent of the injury sustained.

The appellant did not adopt this principle in the charge which she sought to impose upon the guardian. She asked the court to charge the guardian with the eight hundred dollars in the bills of the Mobile bank, "giving him the benefit of what he received for them." If, by this phrase, "giving him the benefit of what he received for them", be meant allowing him a credit for the value of the treasury-

notes, as compared with the bank-bills, no charge could be predicated of the transaction; because the proof shows that he received more than the market value of the bank-bills. But, if it meant that he should be charged with the bank-bills, and credited with the present value of the treasury-notes, the proposition is shocking to the sense of justice. These treasury-notes may have been, and the record conduces to show were, appropriated to the benefit of the ward's estate. There is no evidence that the estate sustained any detriment whatever by the exchange which was excepted to, so far as we can perceive; and we cannot affirm that there was any error in the ruling of the court. We are not to presume either injury to the estate, or *mala fides* in the guardian.

4. The failure to require security on the note of Mr. Knott, and to take a note with security from Mrs. Barringer, for the hire of slaves, was inconsistent with the prevalent usage in the State, and in express violation of section 1751 of the Code, if applicable to guardians. At all events, we think the guardian has, by his failure in the particulars above stated, placed the debts in such a condition of insecurity as to justify charging him on account of it, if the appellant so elects. There is no warrant in the law for the decree, that the guardian should stand as security for the debts.

5. Neither a failure to file annual accounts, nor negligence which works no injury, where there is no *mala fides*, can deprive a guardian of his compensation.—*Powell v. Powell*, 10 Ala. 900; *Craig v. McGehee & Armstrong*, 16 Ala. 41. We do not find in this case, as now presented to us, the facts necessary to justify a denial of compensation to the guardian; but the court below committed an error in determining the compensation by examining witnesses as to the value of the services. No special or extraordinary services appear to have been rendered. This being the case, the guardian could not be entitled to more than the commissions specified in section 1825 of the Code, which is made applicable, by section 2039, to guardians; and the commissions authorized by the second section of the act of 7th December, 1861, (Pamphlet Acts, 1861, p. 52,) and the

court is not bound to allow so much, if, in his opinion, it is unreasonable.—*Allen v. Martin,* 36 Ala. 330, and cases there cited.

The testimony as to the value of the guardian's services may have been admissible, for the purpose of advising the judge as to whether he should allow as much as two and one half per cent., but not for the purpose of fixing the compensation.

6. We perceive no objection to the allowance of the attorney's fee.—*Anderson v. Anderson,* 37 Ala. 683.

Reversed and remanded.

