# GLENN *vs.* GLENN.

[FINAL SETTLEMENT OF ADMINISTRATOR'S ACCOUNTS.]

1. *Dower and quarantine of widow having separate estate.*—The provisions of the Code in reference to the right of dower and proceedings for its assignment, from section 1354 to section 1372, both inclusive, apply only to cases in which the wife has no statutory separate estate; and sections 1991 and 1992, which take away or limit the right of dower of a widow who has a separate estate, apply only to statutory separate estates. (WALKER, C. J., *dissenting.*)

2. *Same.*—A widow who has a statutory separate estate, no matter what its value may be, can not claim, as matter of right, an allotment of dower in any part of her husband's lands; nor has she any right to retain the possession of the dwelling-house, &c., which is but a statutory substitute for quarantine at common law. (WALKER, C. J., *dissenting.*)

3. *Receipt of Confederate treasury-notes by administrator, and conversion thereof.*—An administrator, having received Confederate States treasury-notes for the estate, after the passage of the act approved on the 9th November, 1861, (Session Acts, p. 55,) and having subsequently converted such notes to his own use, is chargeable on final settlement of his accounts, not with their nominal value, but with their actual value in lawful currency at the time of such conversion.

4. *Presumption of retainer by administrator, and consequent extinguishment of debt from intestate.*—Where the husband, at his death, was indebted to the wife for moneys belonging to her statutory separate estate; and she administered on his estate, and received, as such administratrix, personal assets more than sufficient to pay her debt, which were susceptible of conversion into money by sale, and which she retained in specie for six or seven years,—*held,* that the payment and extinguishment of the debt would be presumed, and that the administratrix was entitled, on a final settlement of her accounts, to a credit for the amount of the debt.

5. *Investment by administrator in Confederate States bonds.*—*Held,* on the authority of *Dockery v. McDowell,* (40 Ala. 476,) *Watson v. Stone,* (40 Ala. 441,) and *DeJarnette v. DeJarnette* (at the present term,)that the administratrix in this case was properly refused a credit for certificates of deposit in four-per-cent. bonds of the Confederate States, which she had taken in her own name, and which she never reported to the probate court.

6. *Keeping estate together without order of court; liability of administrator for wood sold and used.*—If an administratrix keeps together her intestate's estate, without an order of court, and the distributees elect to

charge her with the proceeds of the crops raised on the plantation, she can not be charged with the value of the timber cut and used for fuel for herself and the infant distributees, who were her children ; *secus,* as to timber cut and sold.

APPEAL from the Probate Court of Montgomery.

IN the matter of the final settlement of the accounts and vouchers of Mrs. Harriet Glenn, as administratrix of the estate of her deceased husband, Robert J. Glenn; "on the trial of which final settlement," as the record states, " the following agreed case and bill of exceptions were made and taken by the parties :"

" It is agreed in this case, that Robert J. Glenn, the intestate, died in this State, on the 4th day of May, 1858; that the value of his slaves and other personal property, at the time of his death, was forty-four thousand dollars; that the value of his real estate, consisting of fourteen hundred acres of land, at that time was twenty-eight thousand dollars; that said intestate left a widow and three children ; that the widow administered on said estate, on the 22d day of May, 1858, and kept it together without an order of court, cultivating the plantation, until the emancipation of the slaves in the spring of 1865, and accounted each year, in her annnal settlements as administratrix, for the proceeds of the crops, without any objection thereto being made ; that the real estate was a plantation in said county of Montgomery, and was connected with the dwelling-house, where said intestate most usually resided before and at the time of his death ; that the widow, at the death of said intestate, had a statutory separate estate in money, of five thousand one hundred and twenty dollars ; that dower was never assigned to her, nor did she ever make application therefor ; and that she now claims neither dower nor a distributive share of the personalty of said estate, admitting that, since the emancipation of the slaves, her statutory separate estate would be equal to her interest in the estate, both as dowress and as distributee. Upon these facts, the widow asked the court to credit her, in her account as administratrix, with the value of the use and occupation of the said plantation, from the death of her

said husband, until the end of the year 1858, and also for each year separately, to the end of the year 1864, and also with interest on that value, from the end of each year, as it became due. The court allowed the credit, from the death of the intestate to the 1st of January next thereafter, with interest from the commencement of that year; to which ruling the heirs excepted. But the court refused to allow any of the credits asked by the administratrix for any one of the remaining years to the 1st January, 1865 ; to which ruling the administratrix excepted. The court allowed the administratrix, also, a credit for one-third of the annual value of the plantation, from the 1st day of January, 1859, to the 1st day of January, 1865, with interest from the end of each year, upon the amount then becoming due, for use and occupation ; to which last ruling, also, the heirs excepted.

"It is agreed, also, that the children of said intestate, whose names are Mary, Leila, and Annie Glenn, are all minors ; and that the administratrix, as widow, never filed an application to have dower assigned, and that it never was assigned. It appeared, also, during the further progress of the settlement, that the administratrix, at divers times, used Confederate treasury-notes, belonging to the estate, for her own purposes; and the heirs moved the court to charge her, for the notes thus used, with the amounts stated on their face, as payment, *pro tanto*, of the amount due to her on account of her statutory separate estate. The court refused to do this, but charged her with the value in gold of said Confederate treasury-notes at the time she used them; to which ruling, also, the heirs excepted.

" It further appeared in the evidence, that her statutory separate estate was money which had been used by her husband, the said intestate, and was a debt due to her from his estate, which she now claims, with interest from the time of his death ; and that she received, as administratrix, and as assets of his estate, slaves more than sufficient in value to have satisfied her said debt; and that she kept said slaves until their emancipation, without ever petitioning for an order to sell any of them for the payment of said

indebtedness. Upon these facts, the heirs moved to strike out of her account the amount therein claimed by her as a credit, as her statutory separate estate; which the court refused to do, and the heirs thereupon excepted.

"It further appeared, that the administratrix, at various times during her administration, caused wood to be cut from the said plantation, and sold it; and having charged herself, in her account, with the amount of money received for said wood, the said charge was struck out by the court, on motion of her solicitors, on proof that it was timber cut by her from the land; to which ruling, also, the heirs excepted.

"It further appeared, that said administratrix, in the year 1864, had in her hands a large amount of Confederate treasury-notes, which she invested, by and with the advice of her counsel, as the money of the estate, in four-per-cent. certificates of deposit of the Confederate States; that two of said certificates were in her own name, without more, while the third had the word '*adm'rx*' following her name; that the whole amount so invested had been derived by her from the sale of the crops raised on the plantation, from the sale of vegetables raised in a market garden on the place, and from bacon, lard, butter, &c., produced thereon, and from wood cut and sold from the plantation; that the whole amount derived from these various sources, all of which was in treasury-notes of the Confederate States, had been treated by the administratrix as assets of the estate, and had been used by her at divers times, indiscriminately, for estate purposes, so far as was necessary. It could not be determined from which of these various sources the money so used by her had been derived; but it appeared that, previous to the investment, she had received from the wood so cut and sold, at various times, as much money in such treasury-notes as she invested in said certificates; and the said certificates having been claimed by her as a credit, the same were struck out by the court, on motion of the heirs, inasmuch as the charge against her for wood cut and sold had been already struck out, and it did not appear that the certificates had been reported to the probate court, and although the parol testimony of the administratrix showed

that the investment was intended by her for and on account of the estate; to which ruling the administratrix excepted.

"It appeared that the balance against the administratrix, on the 4th June, 1862, was $4,103 84; on the 21st of May, 1863, $5,623 29, being an increase of $1,519 45 over the former balance; and on the 15th March, 1864, $16,076 31, being an increase of $10,453 02 over the last balance. The minor heirs, by their attorneys, moved the court to charge the administratrix with the value in United States paper currency of $4,103 84 in Confederate States treasury-notes, as of their value in United States currency on the 4th June, 1862; and with $1,519 45 in Confederate States treasury-notes, as of their value in United States currency on the 21st May, 1863; and with $10,453 02 in Confederate States treasury-notes, as of their value in United States currency on the 15th March, 1864; which motion the court allowed, and the administratrix excepted.

"It further appeared that the administratrix occupied the dwelling-house on the plantation during a part of each year, and kept it unoccupied during the balance of the time, for her own use, from the 1st day of January, 1859, until the emancipation of the slaves. The heirs moved to charge her with the value of the use and occupation thereof, and the court allowed her to be so charged; to which the administratrix excepted. The heirs moved the court, also, to charge the administratrix with the value of the fire-wood used by her from the plantation, for her own use, at the dwelling-house, during each of the years she kept the estate together and cultivated the plantation, from said 1st January, 1859, until the emancipation of the slaves; which motion the court allowed, and the administratrix excepted."

There are cross appeals and cross assignments of error, by consent, embracing all the rulings of the probate court, to which, as above stated, exceptions were reserved by either party.

ELMORE, KEYES & MORRISSETT, for the administratrix and widow.—1. The widow's right of dower is perfect at the death of her husband, and can not be taken away or affected by

subsequent events, over which she has no control. If she has a separate estate, her dower is diminished *pro tanto;* but the right of dower is not taken away, unless that separate estate exceeds or equals her dower and distributive share of her husband's estate. In this case, the right to dower clearly attached at the death of the husband, when her separate estate was much less than the statute gave without it. Suppose dower had been assigned to her at any time before the emancipation of the slaves, when the relative value of her separate estate and her statutory rights as dowress and distributee was changed; could the subsequent destruction of the entire personalty of the estate, by the emancipation of the slaves, have affected her rights in any manner? could the heirs and distributees have set aside the assignment of dower, or compelled her to refund any part of the amount which she had received?

2. By statute in this State, the widow is entitled to the possession of the dwelling-house, and of the plantation connected with it, until her dower is assigned.—Code, § 1359. The fact that she took no steps to have her dower assigned, is immaterial.—*Oakley v. Oakley*, 30 Ala. 131. This statutory provision was evidently intended as a substitute for quarantine at common law, which it closely resembles; the only differences between the two being, that the statute secures greater benefits to the widow than the common law allowed—1st, in giving her the possession, not only of the principal messuage, but also of the offices, outhouses, &c., and of the plantation connected therewith; and, 2d, in extending the right of possession for an indefinite period, instead of limiting it to forty days. These statutory provisions were evidently founded in the same public policy which the common law evinced in protecting the interests of widows, and were designed to provide a present home and support for them immediately on the death of the husband, which their distress and helpless condition required.—3 Bacon's Abr. 195. The plantation, dwelling-house, &c., are given to the widow, free of rent, in the condition in which they were at the death of the husband. She is made the temporary usufructuary of the property, and occupies the position which the husband

himself, as head of the family, occupied at his death. The only limitation to this right, specified in the statute, is the assignment of dower ; but it may, perhaps, also be terminated by a judicial determination of the fact that the right of dower is gone.

3. Our statutes securing to married women their separate estates, free from the debts and liabilities of their husbands, were designed to further their interests, and to confer on them greater benefits and advantages than former laws extended to them. This being the cardinal object of those statutes, they must receive such a construction as will effectuate that intention. Under the operation of these laws, which have now been in operation for a period of nearly twenty years, there are but few married women who have not some separate estate. The widow has no right of election between her separate estate and her statutory rights as dowress and distributee. To deprive her of the right of dower, because she has a statutory separate estate, would work manifest injustice in many cases, and would, in effect, defeat the purposes of the statutes. To hold the right to dower in abeyance in such cases, until the husband's estate is ready for distribution, would be equally injurious to the widow, and would deprive her of the rights which she enjoyed under former statutes, and under the old common law. A construction which will pervert the express object and design of a statute, and defeat the policy on which it was founded, will never be adopted, unless every other reasonable construction fails.

4. The widow was not chargeable with the value of the timber cut and used as fuel at the dwelling-house. Being tenant of the freehold, by virtue of her quarantine, until her dower was assigned, or (at least) until the emancipation of the slaves, she was entitled to estovers.—2 Bla. Com. 35. If she was liable for use and occupation after the emancipation of the slaves, she was entitled to necessary fire-wood on the same principle.

6. Nor could the widow be charged, on settlement of her accounts as administratrix, with the value of the wood cut and sold from the plantation. If that act amounted to technical waste, it would not render her liable for the pro-

ceeds, as assets, but would, at most, only give a right of action to the heirs.—*Clark v. Burnside*, 15 Illinois, 64.

6. Although the administratrix was authorized, by the act approved 9th November, 1861, to receive Confederate money, or treasury-notes, in payment of debts due the estate, she was not required, as a creditor of the estate, to receive them in payment of the debt due to herself. The right of retainer, which the law gives to an executor or administrator, is a substitute for the right of action, which he would have against any third person; and the doctrine of presumed payment and extinguishment is founded on the right of retainer.—*Kimball v. Moody*, 27 Ala. 130. But the administrator will not be held to a presumed retainer, in the absence of positive proof, where he could not be compelled, as creditor, to accept payment of his debt. Nor can the administratrix, in this case, be charged with a presumed retainer, on account of her failure to apply for an order to sell the slaves; for that would, in effect, charge her with a loss which was not caused by any misconduct, or want of good faith on her part, and which could not have been prevented by ordinary prudence and foresight. If the results of the war had realized the anticipations of our people, her conduct would have been commended as wise and prudent.

7. The administratrix ought to have been allowed a credit for the certificates of deposit in Confederate States bonds. The statutes then in force authorized her to make the investment. The record shows that the investment was made with the funds of the estate, and for its benefit; and no question of good faith is involved. The fact that she took the certificates in her own name individually, does not prevent the certificates from being assets of the estate; for, if she had taken them in her name as administratrix, the legal title would have vested in her, just as it did under the certificates actually taken.—*Tompkeis v. Reynolds*, 17 Ala. 116. Her failure to report the investment to the probate court, within the time required by the statute, does not deprive her of the right to the credit.—*Neilson v. Cook*, and other cases lately decided by this court.

RICE, SEMPLE & GOLDTHWAITE, *contra.*—1. The general principle of law, which is said by Lord Cottenham to be " the result of all the best authorities on the subject," is thus stated by him : " Although losses may be sustained by the conduct of a personal representative, acting strictly within the line of his duty, and exercising reasonable care and diligence, he is not responsible therefor ; yet, if that line of duty be not strictly pursued, and a loss be thereby eventually sustained, such personal representative will be liable to make it good, however unexpected the result, however little likely to arise from the course adopted, and however free such conduct may have been from any improper motive."—*Clough v. Bond*, 3 My. & Cr. 491, and authorities there cited. See, also, 2 Williams on Executors, 1529, 1535–7, 1547 ; 2 Bro. Ch. 156; 11 Wendell, 361; *Gerald v. Bunkley*, 17 Ala. 176. This general principle underlies most of the questions presented in this case. Every violation of it, to meet the supposed necessities (or particular circumstances) of each case that arises, only serves to unsettle the law, and to substitute a doubtful and uncertain, for a fixed and certain rule of liability. An administrator accepts the trust voluntarily, and cannot complain of the responsibility which the laws casts upon him.—*Moyle v. Moyle*, 2 Russ. & Myl. 710.

2. It is the duty of an administrator, generally, within a reasonable time after the grant of letters, to convert into money enough of the personal assets to pay the debts and liabilities of the estate, and make distribution.—*Hasbrouck v. Hasbrouck*, 27 N. Y. 185. Under the laws of Alabama, slaves were deemed perishable property.—*Millard's Adm'rs v. Hall*, 24 Ala. 209. They certainly might have been sold under an order of court, for the payment of debts. The failure of the administratrix to apply for an order of sale, for the unreasonable length of time shown by the record, when there were outstanding claims againt the estate, renders her liable for the losses resulting from such delay. *Beall v. Darden*, 4 Ired. Eq. 76.

3. The administratrix is liable for the hire of the slaves, at least up to the time when she became liable for her

delay and failure to sell them.—*Martin v. Foster,* 38 Ala. Rep. 688.

4. All the decisions of the probate court, adverse to the heirs and distributees, as shown by. the assignments and cross assignments of error, are insisted on.

BYRD, J.—Quarantine, at common law, was the right a widow had to tarry forty days in the principal messuage of her husband.—Scribner on Dower, 14. It is said that this provision was made in consideration of the destitute situation in which the widow is cast by the death of her husband. By statute in this State, a widow may retain possession of the dwelling-house where her husband most usually resided next before his death, with the offices and buildings appurtenant thereto, and the plantation connected therewith, until her dower is assigned, free from the payment of rent.—Code, § 1359. It may be presumed, that this provision was made in lieu of quarantine at common law, and to make it to the interest of the heirs to have dower assigned at an early day. If it is not in lieu of quarantine, it is cumulative.

At common law, the husband was entitled to all the personal property in possession of the wife at the marriage, or which he might reduce to possession during coverture, and also to the rents and profits of her real estate accruing during his life, if the wife survived him ; and if she died first, having issue born alive, whether such issue was living or dead at her death, he was entitled by the curtesy to the lands of the wife during his life. But there is a system of statutory enactments in this State, principally embraced in article III, title 5, part 2, of the Code, (p. 380, §§ 1981 to 1997, inclusive,) which materially modifies these common-law rights. The husband is not entitled to the personal property of the wife belonging to her at the marriage, or subsequently acquired, although he reduces it to possession. The law has secured such property to her, free from the debts of her husband, and the right of disposal of it by him, further than the power conferred on him as trustee to control and manage it. If, then, she has a separate estate at the death of her husband, she has a provision made by

law, which she did not have at common law, to relieve her destitute condition. Besides, the statute giving her the dwelling, offices, and plantation attached, until her dower was assigned, was enacted a long time prior to the statutes which secured to her a separate estate. Among the provisions of the latter, are the two following:

"§ 1991. If a married woman, having a separate estate, survive her husband, and such separate estate, exclusive of the rents, income, and profits, and inclusive of the increase of slaves, is equal to, or greater in value than, her dower interest and distributive share in her husband's estate, estimating her dower interest in his lands at seven years' rent of the dower interest, she shall not be entitled to dower in, or distribution of her husband's estate."

"§ 1992. If her separate estate be less in value than her dower, as ascertained by the rule furnished by the preceding section, so much must be allowed her as, with her separate estate, would be equal to her dower and distributive share in her husband's estate, if she had no separate estate."

This latter section was, in part, construed in *DuBose v. DuBose*, (38 Ala. 238,) in which it was held, that it must be read as if the words "and her distributive share" were inserted immediately after the words "preceding section."

These statutory provisions must be construed in connection with other statutes relating to the same subject-matter, and with the principles of the common law germane thereto.

It has been held by this court, that the statutory right of the widow to retain possession of the dwelling-house, &c., "gives her no estate in the lands until her dower is assigned;" and that her quarantine was not subject to sale under execution against her, although she might be in possession of it.— *Weaver v. Crenshaw*, 6 Ala. 873; *Doe, ex dem. v. Webb*, 18 Ala. 810. It has also been held by this court, that the statutory quarantine attaches only to the premises of which she is dowable.—*Slatter v. Meek and Wife*, 35 Ala. 528; *Harrison v. Boyd*, 36 Ala. 204.

If the husband dies in possession of a dwelling-house and plantation, which he had purchased, and only received a bond for titles when the purchase-money was paid, and an

part was unpaid at his death, whether due or not at that time, the widow is neither entitled to dower, nor to quarantine; and this, however small the balance may be which is unpaid; and so, also, although the whole or any part of the purchase-money may not be due, and the possession of the premises may be vested in the husband until all the purchase-money becomes due. It has also been held by this court, that the provisions of the statute regulating the distribution of the statutory separate estate of a married woman, dying intestate, do not apply to a separate estate created by deed prior to the enactment of the statute securing to married women a separate estate, although the marriage took place subsequent thereto, and the husband, in such case, takes nothing by the statute.— *Willis v. Cadenhead*, 28 Ala. 472; *Hardy v. Boaz*, 29 Ala. 168. And further, that the provisions of the Code, respecting the separate estates of married women, do not apply to separate estates created by deed, either before or since the adoption of the Code.—*Cannon v. Turner*, 32 Ala. 483. And, as this court has held, that a separate estate may be created in a married woman by parol, we see no reason for making any distinction between such an estate and one created by deed, or by testament.—*Jennings v. Blocker's Adm'r*, 25 Ala. Rep. 415.

Upon these adjudications we hold, that the " separate estate" mentioned in sections 1991 and 1992 of the Code is a separate estate created by law, and not one by contract or will.

In *Steadman's Adm'r v. Steadman*, at the present term, we held, that the value of the separate estate of the wife, under sections 1991 and 1992 of the Code, must be ascertained at the time of the distribution of the husband's estate, or when it is ready for distribution, and not at the time of his death, according to the provisions of those sections as construed in the opinion in that case. It results, that, where she has a statutory separate estate, her right to be endowed of the husband's lands is in abeyance until that period. It cannot be ascertained, until that event, whether she will be entitled to dower, nor to what extent she will be entitled, if at all. And the facts of this

case, as shown by the record, clearly illustrate this assertion and conclusion.

The statute provides, that if " such separate estate, *exclusive of rents, income, and profits, and inclusive of the increase of slaves*, is equal to, or greater in value than, her dower interest and distributive share in her husband's estate, estimating her dower interest in his land at seven years' rent of the dower interest, she shall not be entitled to dower in, or distribution of her husband's estate." Now, it seems to us, that this postpones the valuation of her estate to the time of distribution of the husband's estate, or when it is ready for distribution ; otherwise, why did the legislature use the expression, " exclusive of the rents, income, and profits, and inclusive of the increase of slaves?" If the first accrued before the death of the husband, they were given to him ; or, in other words, he was not accountable to " the wife, her heirs, or legal representatives," for them, and they were not subject to the payment of his debts. Hence, that clause of the statute refers to such as accrued between the death of the husband and the distribution of his estate. And as to the latter" —increase of slaves"— why did the statute include them? Such increase, before the husband's death, were a part of the *corpus* of the separate estate ; and it was unnecessary to use the expression, " inclusive of the increase of slaves," if it applied to increase before the husband's death. It must, therefore, have been intended to include such increase between the death of the husband and the distribution of his estate. And for a very good reason ; for she would get the benefit, on a distribution of his estate, of the increase of his slaves ; and so she would of the income and profits of his estate. But the legislature saw that her right to dower would be in abeyance until the distribution, and, very properly, did not require her to account for the rents, income, and profits of her separate estate, from the death of her husband till the distribution, but allowed them to her for her support, in lieu of dower and its consequential fruits—the right of quarantine by the common law, or the statutory substitute.

This view is further enforced by reference to the provisions of section 1992. If her separate estate, valued as re-

quired by the preceding section, should be less than her dower interest in, and distributive share of her husband's estate, why did the legislature provide, that " so much must *be allowed* her as, with her separate estate, would be equal to her dower and distributive share in her husband's estate, if she had no separate estate." If, under these statutes, she had a separate estate at all, even less than her dower and distributive share, the law does not give her any absolute right to dower. It only gives her a right " to so much as, with her separate estate, would be equal to her dower and distributive share in her husband's estate." "So much must be allowed her"—of what? It does not say of land, or money. If the legislature intended to allow so much dower in his land, as would make up the balance due her, it has furnished the probate court no rule, by which to arrive at the quantity or value of the land to be allowed her as dower. Nor has the mode of allotting such fractional dower been prescribed by the statute.

If the term *allotted* had been used, instead of "allowed," then it would be clear that the legislature intended that she should have the balance due her in land ; and on the other hand, the word " *allowed*" is the appropriate one to be used, where an allowance in money is made in lieu of dower, or compensation, as provided in section 1370 of the Code. Where the Code provides that she may take dower in the land, it uses the terms *allot* or *allotment*, as in section 1365, 1366, and 1368.—Dwarris on Statutes, 696.

Without deciding that the widow may not have a right to elect, in a court of equity, to take the balance due her in land, and to apply to that court to ascertain and set it apart to her, not exceeding in any case her dower interest, we are satisfied that the probate court can only allow her so much out of the assets of the estate, as will equalize her separate estate and her " dower interest, as ascertained by the rule furnished" by section 1991 of the Code. The phrase, " so much must be allowed" her, does not, *ex vi termini*, give the widow a right to an assignment of dower in the husband's lands.

We are satisfied, that the provisions of the Code with reference to dower, from section 1354 to section 1372, in-

clusive, apply to the rights of dower of widows who have no statutory separate estate. Any other interpretation of section 1359 would give a widow who had a separate estate, nearly equal to her dower interest and distributive share in her husband's estate, a statutory quarantine equal to what she would be entitled to if she had no estate of any kind; which quarantine might continue for years, and at least for eighteen months; for no dower could be assigned her, until the estate of the husband was, at least, ready for distribution.

The word "dower," as used in section 1359, means dower as defined in section 1354; and is contained in a distinct system of law, though in part relating to the same subject, from that which creates and regulates the statutory separate estates of married women. The legislature never intended to give a widow who had such separate estate, nearly equal to her dower and distributive share in her husband's estate, the right to retain the possession of the premises described in section 1359, until the settlement of the estate of the husband. It would be in derogation of the rights of creditors and heirs; for their hands would be tied, so that they could not have dower assigned, until the final settlement of the estate of the husband, or until it was ready for *final* distribution. For, as before said, section 1359 was adopted for two purposes at least: first, to make provision for the destitute condition of a widow; and secondly, to compel the administrator, or heir, to have dower assigned at an early day. Construing these statutes, relating to the same subject-matter, and with reference to the decisions of this court and the principles of the common law, we come to the conclusion, that a widow, who has a statutory separate estate, is not entitled, as a matter of right, to any part of the land of her husband as dower, to make her statutory separate estate equal to her dower interest and distributive share in his estate.

The law fixes a rule for the valuation in money of her dower interest in her husband's land, as shown by section 1991 of the Code; and it is this value which is brought into the estimate in determining her rights; and this is to

38

be added to the value of her distributive share in the personal estate of her husband, and from this sum total is to be deducted the value of the separate estate she may own, if less than the amount of her dower interest and distributive share of her husband's estate; and " so much must be allowed her" as, with her separate estate, would be equal to her dower and distributive share, "if she had no separate estate."

The word " *allowed,*" in its usual acceptation, *in this connection,* means something substituted by way of compensation for another thing; and to " allot" is usually understood as meaning to set apart a portion of a particular thing or things to some person. Words, used in a statute, should be understood in their usual and common acceptation; and technical words should be considered as used in their common-law meaning, or in the sense in which they are used in particular trades or occupations, when employed in contracts by persons engaged in them.—Dwarris on Statutes, 693 to 697 ; Sedgwick on Statutory and Constitutional Law, 245–6, 261–2.

It is said that, under this doctrine, if the widow had but an insignificant estate, she would not be entitled to the statutory quarantine. But, still she would be entitled, *perhaps,* to have allotted to her, in a court of equity, so much land, not to exceed her dower interest, as would be considered equivalent to the balance due her on the distribution of the estate of her husband, and the rents thereof from the death of her husband, upon a familiar principle of equity jurisprudence. But, however this may be, we are called upon to give a legal construction to the statutory provisions on this subject, and to fix some rule of construction which will govern the courts in the administration of justice. That hardships may result from the view we have taken of the proper construction of the statutes upon this subject, when applied to other cases than the one before us, may be admitted, without assailing the correctness of the rule ; for no general rule can be adopted, without being productive of hardship in some case. The Code seems to treat land, owned by a married woman at her marriage, or subsequently acquired, as a part of her separate estate. If

Glenn v. Glenn.

a different rule from the one laid down were adopted, it is easy to conceive of cases in which it would, in practical application, operate unjustly and inequitably.

The policy of the legislature seems to have been, to separate the estates of the parties to the marriage relation; and yet, upon the death of the husband, to protect the wife, as to her share of his estate, substantially, to the extent that the former law did so, and no further. These statutory provisions have made a *radical* innovation upon the rights of the husband and wife, as they existed at common law, in respect to their respective estates, real and personal. If she has a statutory separate estate, equal to her dower interest and distributive share in her husband's estate, then she is certainly not entitled to dower in his lands ; and if not, upon the authorities above cited, she is not entitled to the statutory quarantine ; and if the value of her separate estate is a little or greatly less than such interest in the husband's estate, she is only entitled to be allowed so much as will make the amount of the value of the separate estate equal to the amount of her dower and distributive share of her husband's estate. If she were entitled to recover the rents for the dwelling-houses, offices, and plantation mentioned in section 1359 of the Code, or to retain the possession of them, it would destroy the equality which the statute intended to maintain, (in creating, protecting, and disposing of the separate estates of married women,) between the parties to the marriage relation, as to their respective estates. For the widow, if entitled to the statutory quarantine, where she has a statutory separate estate, would, if a different rule is to prevail, get the premises mentioned in section 1359, free of rent, until the estate of her husband was ready for distribution, let it be long or short, and would thereby defeat the rights of creditors and heirs, who could not, before that event, assign or allot her dower, it should term out that she were entitled to it. And if only entitled to be endowed in less than the dower interest as fixed by section 1355 of the Code, they could not, nor could the court, ascertain the amount to which she was entitled, so as to make the allot-

ment. It does not appear in this case when the estate was ready for final distribution.

We concede the inherent difficulty which exists, in giving a judicial construction to the statutes relating to this subject, *even* with all aids furnished by the common law. It has been our object to construe them so as to give effect to the legislative intention; and if we have failed in comprehending what that intention was, it is easy for the legislative department to declare what shall hereafter be the rule in such cases. The conclusion to which we have come, is the one which our judgments attain, after a careful examination of the principles of law and their just application to the subject in hand.

The court therefore erred, in allowing the credit for the use and occupation of the plantation, " from the death of the husband, to the 1st January next thereafter"; and did not err in refusing to allow a credit therefor for each year thereafter to the 1st day of January, 1865; but erred in allowing her one-third of the rents thereof from the 1st January, 1859, to January 1st, 1865. The court also erred, in striking from the account the money charged for wood cut and sold from the lands of the intestate. The court did not err, in charging the administratrix with the value of the use and occupation of the dwelling-house on the plantation.

So far Justice Judge and myself concur in opinion; and the Chief Justice concurs *alone* as to the charge of the value of the wood cut and sold from the land. The subsequent part of this opinion is the result of a concurrence of my brethren, from which I dissent in part.

[3.] The separate estate of the administratrix consisted of a debt due her by her deceased husband, the intestate. She used, " at divers times," Confederate treasury-notes belonging to the estate. The distributees moved for a charge against her of the nominal amount of the Confederate money thus used, to the extent of the debt due to her as her separate estate. The administratrix, in accepting the Confederate money, was guilty of no legal impropriety, if it was done after the adoption of the act authorizing it on the 9th November, 1861.— *Watson v. Stone*, 40 Ala. Rep.

451 ; *Neilson v. Cook*, 40 Ala. 498 ; *Dockery v. McDowell*, 40 Ala. 476. In appropriating such money to her own use, she was guilty of a conversion, and became chargeable with the value of the notes so converted.—*Harris v. Parker*, at the present term. As a creditor of the estate, she was not bound to accept payment of her debt in such treasury-notes; and neither law nor justice would authorize us to hold her debt extinguished by an equal amount of the depreciated currency, according to the sum called for upon its face. She was legally chargeable with the value, in constitutional currency, of such treasury-notes converted by her. The court, therefore, did not err in its ruling on the motion of the heirs, and in charging her with the value of the Confederate treasury-notes at the time of conversion.

[4.] There was sufficiency of personalty, susceptible of conversion into money by sale, to have satisfied the debt of the intestate due to the administratrix, and belonging to her separate estate. She had ample time, (six or seven years,) within which to make the appropriation of assets to the discharge of her debt. The law therefore raises the presumption that she did so.—*Kimball v. Moody*, 27 Ala. 130. If payment rested upon evidence of the fact that she had really appropriated the assets to the payment of her debt, she would be entitled to a credit for the amount. Why should it be different when such appropriation is legally presumed? It would be the clearest injustice to hold her debt discharged out of the assets, and not allow her the credit necessarily incident to such discharge. The court therefore committed no error, in refusing to strike out the credit for the amount of the separate estate due the administratrix, existing in the form of a debt due to her by the intestate.

[5.] The court did not err, in striking out the certificates taken in the individual name of the administratrix, with which she had credited herself in her account. And this we hold upon the authority of the cases of *Dockery v. McDowell, (supra,) Watson and Wife v. Stone, (supra,)* and *De Jarnette v. De Jarnette*, at the present term.

My general views, which lay at the foundation of the matters of this opinion from which I dissent, may be seen

in the dissenting opinions in the cases of *Dockery v. McDowell, (supra,)* and *Scheible v. Bacho,* at the present term.

[6.] As to the charge of fire-wood, used by the administratrix : If on another trial it appears that she used it on the plantation for herself and children, she should not be charged with it, as they elected to take the proceeds of the crops. The court erred in charging her with fire-wood.

It results, that upon the appeal taken by the administratrix from the rulings of the court below assigned by her as error, the decree must be reversed on the point last noticed ; and that upon the appeal taken by Mary Glenn, a distributee, from the rulings of the court assigned by her as error, the decree of the court below must be reversed, and the cause remanded for further proceedings in conformity to this opinion.